UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABUCAR NUNOW ABIKAR, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BRISTOL BAY NATIVE CORPORATION, et al.,<br><br>Defendants. | Case No.: 3:17-cv-01036-GPC-AGS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>**[ECF No. 7]** |

Before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint ("FAC"). (ECF No. 7.) The motion is fully briefed. Based on the moving papers, and for the reasons below, the Court GRANTS in part and DENIES in part the motion to dismiss.

I. **Allegations**

In this putative class action, Plaintiffs allege the following relevant facts. Plaintiffs are East African refugees who currently are, or formerly were, employees of Defendants Bristol Bay Corporation ("BBNC"), Glacier Technical Solutions, LLC ("GTS"), and Workforce Resources, LLC ("Workforce"). (FAC, ECF No. 5 at ¶ 2.) BBNC is an Alaskan Native Corporation based in Anchorage, Alaska. (FAC ¶ 30.) BBNC wholly owns GTS and Workforce. (FAC ¶¶ 31–32.) BBNC "operates as a joint employer with

GTS and Workforce. . . by sharing or codetermining policies, human resource functions, management functions, and more." (FAC ¶ 30.) GTS and Workforce maintain offices in Oceanside, California. (FAC ¶¶ 31–32.)

Defendants contract with the Department of Defense to train Marines in foreign cultures. (FAC ¶ 3.) In doing so, Defendants employ East African refugees, on a "temporary, part-time, and sporadic" basis, to "role play" as residents of a foreign nation as a way to accustom American soldiers to African cultures. (*Id.*) Plaintiffs "performed most of their work on various U.S. military bases, particularly but not exclusively on Camp Pendleton in Oceanside, California," but "also worked off military bases, particularly but not exclusively in and near" GTS and Workforce's shared offices outside of Camp Pendleton. (FAC ¶ 7.) Plaintiffs are from extremely poor communities and are mostly "Somali Bantu immigrants who were driven from their homeland of Somalia by civil war and terrorism that began 25 years ago and continue to today." (FAC ¶ 4.) Few understand English, most are illiterate in their native language, and "[m]ost or perhaps all" live below the federal poverty line. (*Id.*)

According to the complaint, "[t]he Defendants have a consistent and pervasive history . . . of treating East African role-players less favorably than role-players who are not East African," such as employees of Iraqi, Afghani, or Filipino descent. (FAC ¶¶ 6, 9.) This differential treatment "was and is advanced and effected" by Site Manager Habit Tarzi, and "adopted and endorsed by other management employees including" General Manager Carol Giannini, Scheduling Manager Weston Giannini, Assistant Site Manager Atiq Hamid, and Deputy Project Manager David Tarzi. (*Id.*) These decisions were "made and effected" from "locations outside military bases" including GTS and Workforce offices in Oceanside and Anchorage, Alaska. (FAC ¶ 8.) When employees complained of the disparate treatment and harassment, Defendants worsened their actions and threatened the employees with termination. (FAC ¶ 9.) Between December 2015 and February 2016, East African role players filed claims of discrimination, harassment, and retaliation with the federal Equal Employment Opportunity Commission ("EEOC").

(FAC ¶ 10.) The East African role players also filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") on July 12, 2016, alleging violations of protected concerted activity. (FAC ¶ 11.)

In this action, Plaintiffs categorize themselves into three putative classes: (1) East African refugees from Somalia, Ethiopia, the Democratic Republic of Congo, and Burundi (the "East African Class"); (2) female East African refugees (the "Female Class"); and (3) Muslim East African refugees (the "Muslim Class"). (FAC ¶ 13.) With respect to the East African Class, Plaintiffs allege that "Defendants engaged in a continuing policy and practice of discrimination and harassment based on race, color, and national origin . . . by denying them terms and conditions of employment that were as favorable as those provided to non-East African Class members," including "subjecting members of the East African Class to daily or near-daily insults, ridicule, scorn, mockery, and other disparagements direct towards their race, color, national origin, language culture, and traditions"; requiring East African Class members to "perform janitorial duties that were outside their job description . . . for the benefit of Defendants without compensation"; denying East African Class members "promotional opportunities, rest and meal breaks, drinking water, food and snacks, and transportation"; and retaliating against the East African Class members for complaining about this adverse treatment. (FAC ¶ 14.) With respect to the Female Class, Plaintiffs allege that Defendants "engaged in a continuing policy and practice of discrimination and harassment based on gender/sex . . . by denying them terms and conditions of employment that are as favorable as those provided to Female Class members," including "subjecting members of the Female Class to daily or near-daily insults, ridicule, scorn, mockery, and other disparagements directed toward their gender/sex"; "refusing to allow members of the Female Class to wear traditional clothing but allowing non-Female Class members to wear traditional clothing"; requiring Female Class members to "perform stereotypically female cleaning and housekeeping duties not within their job description . . . without compensation"; denying Female Class members "promotional opportunities to the same

extent and in as favorable a manner" as non-Female Class members; and retaliating against Female Class members for complaining about their adverse treatment. (FAC ¶ 15.) With respect to the Muslim Class, Plaintiffs allege that Defendants "failed to provide [them] religious accommodation . . . as required by law, and engaged in a continuing policy and practice of discrimination and harassment based on religion . . by denying them terms and conditions of employment that are as favorable as those provided to non-Muslim Class members," including "subjecting members of the Muslim Class to daily or near-daily insults, ridicule, scorn, mockery, and other disparagements directed toward their religion and religious practices"; "failing to provide religious accommodation to members of the Muslim Class but allowing such accommodation to non-Muslim Class members"; and retaliating against Muslim Class members for complaining about their adverse treatment. (FAC ¶ 16.)

Plaintiffs assert the following claims: (1) race discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) color discrimination and harassment in violation of Title VII; (3) national original discrimination and harassment in violation of Title VII; (4) race discrimination with respect to the making, performance, and termination of contracts in violation of 42 U.S.C. § 1981; (5) gender/sex discrimination in violation of Title VII; (6) religious discrimination and harassment (including denying a religious accommodation) in violation of Title VII; (7) race discrimination and harassment in violation of the California Fair Employment and Housing Act ("FEHA"); (8) color discrimination and harassment in violation of FEHA; (9) national original discrimination and harassment in violation of FEHA; (10) gender/sex discrimination in violation of FEHA; (11) religious discrimination and harassment (including denying a religious accommodation) in violation of FEHA; (12) failure to prevent discrimination and harassment in violation of FEHA; and (13) retaliation in violation of FEHA. (FAC ¶¶ 73–151.)

Defendants now move to dismiss Plaintiffs' complaint in the entirety, and in the alternative, strike Plaintiffs' allegations involving conduct prior to the statute of

limitations. (ECF No. 7.)

## II. Rule 12(b)(6) Challenges

### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) motion attacks the complaint as containing insufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

### B. Title VII's Applicability to Defendants

Defendants contend first that Plaintiffs' Title VII actions must be dismissed because BBNC is an Alaska Native Corporations ("ANCs") and, as such, it and its wholly owned subsidiaries are not governed by Title VII. The Alaska Native Claim Settlement Act ("ANCSA") establishes:

> [f]or the purposes of implementation of the Civil Rights Act of 1964 [42 U.S.C. § 2000a *et seq.*], a Native Corporation and corporations, partnerships, joint ventures, trusts, or affiliates in which the Native Corporation owns not less than 25 per centum of the equity shall be within the class of entities excluded from the definition of "employer" by section 701(b)(1) of Public Law 88-352 (78 Stat. 253), as amended [42 U.S.C. § 2000e(b)(1)], or successor statutes.

43 U.S.C. § 1626(g). In other words, Title VII does not apply to ANCs and their wholly owned subsidiaries.

According to the FAC, BBNC is "an Alaskan Native Corporation." (FAC ¶ 30.) BBNC is therefore not governed by Title VII's requirements and prohibitions. Moreover,

5

according to the FAC, GTS and Workforce are both "wholly owned subsidiar[ies]" of BBNC. (FAC ¶¶ 31–32.) Because GTS and Workforce are "affiliates in which the Native Corporation owns not less than 25 per centum of the equity," GTS and Workforce are also excluded from the definition of "employer" under Title VII. *See, e.g.*, *Pratt v. Chenega Integrated Sys.*, No. C 07-01573 JSW, 2007 WL 2177335, at *2–3 (N.D. Cal. July 27, 2007) (dismissing Title VII claims because the defendant "is at least 25% owned by a Native Corporation," and plaintiff did not contest that status).

Plaintiffs respond by asserting that Defendants have "waived" their exclusion from the definition of employer under Title VII by signing an agreement with the Department of Defense. (ECF No. 10 at 5–11.) This argument lacks merit. Parties cannot amend a statutory provision via contract. They can, of course, agree on terms in a contract paralleling the requirements and prohibitions of a statute. But even if Defendants' contract with the federal government commits Defendants to a nondiscrimination policy mirroring Title VII, Plaintiffs would not be able to seek legal redress *through* Title VII; instead, Plaintiffs would have to rely on a different source of law for their claims. *See Pratt*, 2007 WL 2177335 at *3–4 (rejecting plaintiff's claim that the defendant waived its exemption from Title VII by including an "Equal Employment Opportunity Statement" in its employee handbook because "a party thus designated cannot waive a statutory exemption or create subject matter jurisdiction"). Because the FAC clearly and exclusively invokes Title VII as the source of law under which Plaintiffs sue for Counts One, Two, Three, Five, and Six, those claims must be dismissed.

### C. The FEHA Claims' Timeliness

Defendants assert that Plaintiffs' FEHA claims are untimely. Under FEHA, an individual must bring a civil action against the employer within one year of the date the California Department of Fair Employment and Housing ("DFEH") issues a right-to-sue notice. Cal. Gov. Code §§ 12965(b), 12965(d); *Acuna v. San Diego Gas & Elec. Co.*, 159 Cal. Rptr. 33 749, 757 (Ct. App. 2013) ("This code establishes a strict 'one-year statute of limitations, commencing from the date of the right-to-sue notice by the

[DFEH],' except for certain statutory exceptions."). This limitations period is tolled, however, when the following three "requirements have been met": (1) "[a] charge of discrimination or harassment is timely filed concurrently with the Equal Employment Opportunity Commission [("EEOC")] and the [DFEH]"; (2) "[t]he investigation of the charge is deferred by the [DFEH] to the [EEOC]"; and (3) "[a] right-to-sue notice is issued to the person claiming to be aggrieved upon deferral of the charge by the [DFEH] to the [EEOC]." *Id.* § 12965(d)(1). These three conditions were met here. The right-to-sue notices sent by the DFEH to Plaintiffs indicate that their complaints were "being dual filed with" the DFEH and EEOC; the EEOC would be "responsible for the processing" of the complaint; and "[p]ursuant to [§ 12965(d)(1), Plaintiffs'] one-year period [to file FEHA claims] will be tolled during the pendency of the EEOC's investigation." (ECF No. 7-4, Exs. 34–49.[1])

"The time for commencing an action for which the statute of limitations is tolled under [§ 12965(d)(1)] expires when the federal right-to-sue period to commence a civil action expires, or one year from the date of the right-to-sue notice by the [DFEH], whichever is later." *Id.* § 12965(d)(2). Here, the "later" of the two deadlines discussed in § 12965(d)(2) was Plaintiffs' federal deadline. The DFEH issued right-to-sue notices to Plaintiff Deh on January 4, 2016; Plaintiff Abikar on January 5, 2016; Plaintiff Muganga on January 7, 2016; Plaintiffs Awmagagan and Mohamed on February 2, 2016; Plaintiff Madende on February 24, 2016; and Plaintiffs Musa and Somon on February 26, 2016. (ECF No. 7-4, Exs. 34–49.) Based on the dates of Plaintiffs' DFEH right-to-sue notices recited above, the state statute of limitations for Plaintiffs to file their FEHA claims expired no later than February 26, 2017, one year after the last right-to-sue notice was issued.

---

[1] The court takes judicial notice of the right-to-sue notices sent by the EEOC and DFEH to Plaintiffs, the accuracy of which are not in dispute. *See, e.g.*, *Dornell v. City of San Mateo*, 19 F. Supp. 3d 900, 904 n.3 (N.D. Cal. 2013) (taking judicial notice of right-to-sue letter).

Plaintiffs' federal deadline came later. The EEOC issued all Plaintiffs individual right-to-sue notices on February 14, 2017. (ECF No. 7-4, Exs. 17–32.) Federal law requires an individual to file suit under Title VII "within ninety days after the giving of [an EEOC right-to-sue] notice." 42 U.S.C. § 2000e-5(f)(1). That time period begins "from the date on which a right-to-sue notice letter arrived at the claimant's address of record." *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1121 (9th Cir. 2007). The Ninth Circuit applies a rebuttable presumption that an individual received an EEOC right-to-sue notice three days after it was mailed. *Id.* at 1125–26. There being no suggestion that Plaintiffs received their notices earlier or later than three days after the EEOC issued its notices, the Court applies this presumption and assumes that Plaintiffs received the EEOC's February 14, 2017 right-to-sue notices on February 17, 2017. To meet the federal deadline, Plaintiffs had to file suit no more than 90 days after the date of their receipt, which was May 18, 2017. Because the federal deadline (May 18, 2017) was later than the state deadline (February 26, 2017), the federal deadline governs under § 12965(d)(2). Plaintiffs filed this suit on May 18, 2017. (ECF No. 1.) Plaintiffs therefore filed their original complaint prior to the expiration of the deadline set forth in § 12965(d)(2).

There is, however, an additional complication. While Plaintiffs filed the original complaint before the expiration of the period to file their FEHA claims, that original complaint asserted *only* federal claims. (*See* ECF No. 1.) It was not until October 6, 2017, that Plaintiffs amended their complaint to include FEHA claims. (*See* ECF No. 5.) Defendants argue that this fact renders Plaintiffs' FEHA claims untimely because "[c]ourts have repeatedly determined that bringing Title VII claims under federal law does not toll FEHA claims under state law, and vice versa." (ECF No. 7-1 at 15.) The two cases Defendants cite, however, do not support that proposition. Defendants first cite *Thomas v. City & Cty. of San Francisco*, No. 03-1258 MMC, 2004 WL 1091146, at *2 (N.D. Cal. May 4, 2004), in which the court rejected the plaintiff's effort to use her timely FEHA claims to save her untimely Title VII claims. In *Dornell v. City of San*

*Mateo*, 19 F. Supp. 3d 900 (N.D. Cal. 2013), the plaintiff filed an EEOC claim on June 14, 2002, which the DFEH constructively received under a worksharing agreement. *Id.* at 908. The DFEH issued a right-to-sue notice on June 22, 2012, but the plaintiff did not receive an EEOC right-to-sue notice until October 31, 2012. *Id.* at 903. The plaintiff filed her original complaint on November 29, 2012 (less than 90 days after receiving the EEOC notice), but asserted only federal claims. *Id.* On August 30, 2013, the plaintiff filed an amended complaint, adding FEHA claims mirroring the earlier-filed federal claims. *Id.* at 903, 908. The court found that the plaintiff's federal claims were timely, but that the FEHA claims were untimely because those claims were first asserted more than a year after the date of the original DFEH notice[2] and more than 90 days after receiving the EEOC notice. *Id.* at 908.

The *Thomas* and *Dornell* courts, however, missed a crucial part of this analysis: whether the plaintiffs' untimely claims related back to their timely claims. "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . ." Fed. R. Civ. P. 15(c)(B). The Ninth Circuit has offered the following guidance regarding whether Rule 15(c)(B) renders timely an otherwise untimely amended claim:

> An amended claim arises out of the same conduct, transaction, or occurrence if it will likely be proved by the same kind of evidence offered in support of the original pleading. To relate back, the original and amended pleadings [must] share a common core of operative facts so that the adverse party has fair notice of the transaction, occurrence, or conduct called into question. The relation back doctrine of Rule 15(c) is liberally applied.

*ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (citations and

---

[2] Further complicating the analysis (but irrelevant here) was the fact that the plaintiff in *Dornell* had filed an additional charge with the DFEH and received a notice from the DFEH two days before she filed her amended complaint. But, as the court explained, the FEHA claims the plaintiff added were based only on the allegations in her original DFEH charge. *Id.* at 908.

9

internal quotation marks omitted). Here, Plaintiffs' FEHA claims relate back to the timely Title VII claims because the FEHA claims are based on the exact same conduct as the Title VII claims. (*Compare* ECF No. 5 *with* ECF No. 1.) Because the factual allegations supporting Plaintiffs' Title VII and FEHA claims are identical, Defendants had "fair notice of the transaction, occurrence or conduct called into question" in the FEHA claims by the original complaint. Other courts in this circuit have found that untimely claims of discrimination—based on the same facts as earlier, timely filed claims—related back so as to render the late claims timely. *See, e.g.*, *Nardo v. Hawai'i*, Civ. No. 08-00352 JMS/LEK, 2008 WL 5082758, at *2–3 (D. Haw. Dec. 2, 2008) ("Although the Ninth Circuit has not directly addressed this issue, other courts have held that ADA and ADEA claims made beyond the 90-day limitations period may relate back to an original, timely pleading where the discrimination alleged in both is premised on the same facts."); *Miranda v. Costco Wholesale Corp.*, Civ. No. 95-1076-JO, 1996 WL 571185, at *2–3 (D. Or. May 7, 1996) (finding that the plaintiff's untimely Title VII claim related back to a timely state law employment discrimination claim because the two claims "arose out of the same set of facts"). Because Plaintiffs' Title VII claims were timely filed, and Plaintiffs' later-filed FEHA claims relate back to their Title VII claims, the FEHA claims are timely.

### D. The Federal Enclave Doctrine

Defendants assert that the Court should dismiss Plaintiffs' FEHA claims under the federal enclave doctrine. This doctrine originates from Article I, Section 8, Clause 17, of the United States Constitution, which "provides that Congress shall have the power to exercise exclusive legislation over all places purchased by the consent of the legislature of the state in which the same shall be." *Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1147 (S.D. Cal. 2007). "This constitutional provision permits," with some exceptions, "the continuance of those state laws existing at the time of surrender of sovereignty." *Id.* "Only state laws in effect at the time of cession or transfer of jurisdiction, however, can continue in operation. Laws subsequently enacted by the state are inapplicable in the

federal enclave unless they come within a reservation of jurisdiction or are adopted by Congress." *Id.* (citation omitted).

The Court takes judicial notice of the fact that Camp Pendleton is a federal enclave, and that the federal government purchased that land from the State of California "no later than December 31, 1942." *Id.*; *accord Cooper v. S. Cal. Edison Co.*, 170 F. App'x 496, 497 (9th Cir. 2006) ("[The San Onofre Nuclear Generating Station] is located within a federal enclave, acquired by the United States in 1941 when it established Camp Pendleton."). California enacted the original version of FEHA in 1959, at least 16 years after Camp Pendleton became a federal enclave. *Stiefel*, 497 F. Supp. 2d at 1149. Because California enacted FEHA after Congress made Camp Pendleton a federal enclave—and Plaintiffs have identified no "reservation of jurisdiction by California or that FEHA was adopted by Congress," *id.*—FEHA does not apply to conduct occurring on Camp Pendleton.

Plaintiffs do not appear to dispute that their FEHA claims are barred to the extent that they are premised on conduct occurring on Camp Pendleton. Instead, Plaintiffs offer two arguments in response: (1) Defendants made their "decisions regarding the plaintiffs' employment from locations outside California," and (2) FEHA still applies to Plaintiff's work performed outside of Camp Pendleton. (ECF No. 11 at 21–23.) Plaintiffs' first argument is plainly meritless: "the plaintiff's place of employment [i]s the significant factor in determining where the plaintiff's employment claims arose under the federal enclave doctrine." *Lockhart v. MVM, Inc.*, 97 Cal. Rptr. 3d 206, 212 (Ct. App. 2009). Whether an employer made certain employment decisions outside of the federal enclave is not pertinent to the applicability of the federal enclave doctrine. *See id.* at 212–13 (collecting cases).

Plaintiffs' second argument, however, is persuasive. Defendants offer no compelling reason why FEHA would not apply to Plaintiffs' work performed outside of a federal enclave. As the FAC states, Plaintiffs engaged in work outside of Camp Pendleton:

> The East African employees performed most of their work on various U.S. military bases, particularly but not exclusively on Camp Pendleton in Oceanside, California. The East African employees *also worked off military bases, particularly but not exclusively in and near the shared offices of defendants GTS and Workforce, and outside the gates of Camp Pendleton.*

(FAC ¶ 7 (emphasis added).) Defendants respond first by arguing that it is "implausible" that Plaintiffs would "be summoned to an administrative location to perform hours of office work" in light of the fact that Plaintiffs mostly cannot speak or read English. (ECF No. 17 at 9.) The FAC, however, does not allege that Plaintiffs were summoned to non-enclave offices for "office work." For example, the FAC states that Defendants forced Plaintiffs, on a discriminatory basis, to perform unpaid janitorial work.[3] (*See* FAC ¶¶ 14, 15.) It is also plausible that Plaintiffs performed their normal role-playing work at GTS and/or Workforce offices.

Defendants also suggest that the federal enclave doctrine bars FEHA claims even if "portions of [Plaintiffs'] work occurred off-base." (ECF No. 17 at 9.) In essence, Defendants suggest that there is an established "de minimis" rule within the federal enclave doctrine, which instructs that so long as *most* of a plaintiff's work is performed within the boundaries a federal enclave, state law also is inapplicable to work performed outside the enclave. But the cases Defendants cite do not support this theory. Defendants first cite *Lockhart*, in which the plaintiff argued that the federal enclave doctrine was inapplicable to her claims because her "termination was decided and implemented at respondent's headquarters" outside of a federal enclave. 97 Cal. Rptr. 3d at 211. Rejecting that argument, the court explained that the plaintiff "was, at all relevant times, employed by a federal contractor *working on a federal enclave*." *Id.* at 213

---

[3] Defendants argue that Plaintiffs are "modify[ing] their allegations to suit their changing needs" because the FAC asserts that Plaintiffs were hired to work as role players in simulated villages, not for janitorial work. (ECF No. 17 at 9.) The Court disagrees. The fact that Plaintiffs were hired for one purpose does not make it implausible that Defendants later forced Plaintiffs, on a discriminatory basis, to engage in work outside of their job description.

(emphasis added). Here, by contrast, there is more than the assertion that employment decisions were made outside of the enclave—Plaintiffs allege that they also *worked* outside of the enclave. For the same reason, this case is unlike *Powell v. Tessada & Assocs., Inc.*, No. C 04-05254 JF, 2005 WL 578103, at *2 (N.D. Cal. Mar. 10, 2005) (rejecting argument that the defendant made decision outside of the federal enclave because "regardless of where the decision not to retain Plaintiffs was made, the decision reflects Defendants' employment practice *on the enclave*"), and *Naigan v. Nana Servs., LLC*, No. 12-CV-2648-LAB (NLS), 2013 WL 5278641, at *2 (S.D. Cal. Sept. 18, 2013) (rejecting argument that the defendant "made decisions and initiated communications at its headquarters" in Alaska).[4]

*Lockhart*, *Powell*, and *Naigan* all rejected Plaintiffs' first argument addressed above, *i.e.*, the fact that Defendants made employment decisions outside the federal enclave renders the doctrine inapplicable. They do not, however, address the issue of the federal enclave doctrine's applicability to an employee's work performed outside of the enclave. Because "the plaintiff's place of employment" determines the applicability of the federal enclave doctrine, it appears that where Plaintiffs performed their work is crucial in determining the doctrine's applicability. In the absence of any authority supporting a de minimis rule suggested by Defendants, the Court is persuaded that the federal enclave doctrine does not bar Plaintiffs' FEHA claims to the extent they are premised on work Plaintiffs performed outside of Camp Pendleton.

**E. Section 1981**

Defendants contend that Plaintiffs' allegations are insufficient to state a claim under 42 U.S.C. § 1981. With respect to this claim, the FAC alleges that Defendants'

---

[4] Defendants separately cite *Naigan*'s statement that "[t]he application of state law to claims that did not arise within California's jurisdiction creates a due process problem." 2013 WL 5278641, at *2. Defendants use this quotation out of context. There, the *Naigan* court was discussing the due process problem that would occur if courts applied California law to conduct that occurred in Alaska. Here, by contrast, Plaintiffs allegedly performed the outside-enclave work in California. Applying California law to conduct occurring in California presents no due process concern.

13

"practices and policies" discussed throughout the FAC "constitute illegal race discrimination with respect to the making, performance, and termination of contracts." (FAC ¶ 90.) "Section 1981 prohibits discrimination in the making and enforcement of contracts by reasons of race, including color or national origin differences. The term 'make and enforce contracts' including the making, performance, modification, and termination of contracts." *Flores v. City of Westminster*, 873 F.3d 739, 752 (9th Cir. 2017) (internal quotation marks omitted). "Analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004). A plaintiff therefore can state a claim under § 1981 by alleging "facts demonstrating that: (1) he is a member of a protected class; (2) he was qualified for the position he sought or held; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated differently." *Bastidas v. Good Samaritan Hosp.*, No. C 13-04388 SI, 2014 WL 3362214, at *2 (N.D. Cal. July 7, 2014).

Defendants' sole argument is that Plaintiffs' allegations are insufficient because they assert mere "boilerplate" regarding the conditions of their employment. Defendants aver that other courts have dismissed analogous allegations, but the cases Defendants cite differ from the allegations asserted in Plaintiffs' FAC. In *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82 (D.D.C. 2010), the plaintiff alleged that her co-workers were violating company policies and subjecting the plaintiff to a hostile environment, but she never offered allegations suggesting that this mistreatment was a result of the plaintiff's race. As the court stated, "[t]he only suggestion that plaintiff's race or color played any role in her interactions with Godwin and Williams are plaintiff's conclusory statements that she was 'terminated . . . based on [her] race' and 'color.'" *Id.* at 88. Because that conclusory statement alone did not "suggest a racially discriminatory motive for defendants' treatment of plaintiff," the allegations did not meet the requirements of Rule 8. *Id.* at 88–89. Here, by contrast, Plaintiffs' allegations—that they were subjected to ridicule to

which members of other national origin groups were not, were forced to perform unpaid work outside of their job descriptions that other national origin groups were not, and were denied benefits given to other national origin groups—give rise to an inference of discriminatory treatment.

For the same reason, this case is distinguishable from *Bastidas*. There, the plaintiff—a physician born in Colombia—claimed that he was discriminated against when the defendants suspended his operating privileges after one of his patients died three days after surgery. *Bastidas v. Good Samaritan Hosp.*, 2014 WL 1022563, at *1–2 (N.D. Cal. Mar. 13, 2014). The plaintiff pointed to a "warning" given to him by another physician that if plaintiff "got 'outside the box,'" the plaintiff "would be blackballed." *Id.* at *1. The court rejected the plaintiff's argument that this warning was motivated by racial animus because, *inter alia*, the plaintiff "failed to allege any facts that would reasonably support such an interpretation of this facially neutral statement." *Id.* at *4. The plaintiff also alleged that "minority physicians at the hospital received disparate treatment from their white colleagues" by citing "multiple instances in which minority physicians at GSH were the subjects of adverse employment actions." *Id.* The court found these allegations lacking because they did not suggest that the *plaintiff's* contractual relationship with the defendant. *Id.* ("[P]laintiff's examples of other physicians' hardships are unavailing."). In a later ruling, the court again found the plaintiff's allegations inadequate because, while the plaintiff identified two instances in which white physicians were not disciplined after patient deaths, the plaintiff had not alleged that those physicians' "surgeries were similar to plaintiff's failed surgery, and that their treatment of their patients was of the type that might trigger privileging and peer review actions." *Bastidas*, 2014 WL 3362214 at *3.

Plaintiffs' allegations here are distinguishable from *Bastidas* on all fronts. The FAC presents allegations that *do* raise the inference that Plaintiffs' disparate treatment was racially motivated because Plaintiffs, as a national origin group, were the only employees subjected to ridicule, forced to perform unpaid additional work, and denied

15

benefits.  Moreover, unlike in *Bastidas*, Plaintiffs' allegations suggesting disparate treatment relate not to other employees, but to Plaintiffs themselves.

Finally, Plaintiffs' allegations are similarly distinguishable from those in *Jackson v. Universal Health Servs., Inc.*, No. 2:13-cv-01666-GMN-NJK, 2014 WL 4635873 (D. Nev. Sept. 15, 2014).  There, plaintiff—an African-American female who worked for the defendant as a Monitoring Tech/Unit Coordinator—asserted, *inter alia*, race discrimination by alleging that she was "referred to as 'RuPaul,' who is an African-American male cross-dresser"; "was held to different work standards and protocols than her non-African-American" co-workers; and "was referred to as being part of a group of employees whom [a supervisor] described as 'lazy pieces of crap," and "whiny bitches." *Id.* at *1.  The plaintiff was later terminated for failing to follow protocol, a reason that was—according to the plaintiff—pretext for discrimination.  *Id.*  The court found these allegations insufficient to state a claim under § 1981 because, other than the "RuPaul" comment's "potential" racial connotation, "none of the other acts identified by Plaintiff . . . appear to have any relation to Plaintiff's race."  *Id.* at *3.  Here, again, Plaintiffs have identified a reasonable basis for inferring disparate treatment by identifying harassment pointed solely to their racial group and their being the only racial group forced to engage in unpaid work outside of their job description and denied benefits.

It is worth noting, however, that Defendants correctly argue Plaintiffs' § 1981 claim may be brought only under a theory of disparate treatment on the basis of race. Plaintiffs cannot pursue their § 1981 claim under theories of religious or sex discrimination, nor can they prove their § 1981 claim under a disparate impact theory. *See, e.g.*, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) ("We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination."); *Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004) (Section 1981 "does not protect against discrimination on the basis of gender or religion").

### III. General Challenges to the FAC

Defendants include in their motion a section with the heading "All Defendants Move to Dismiss All of Plaintiffs' Claims Due to Plaintiffs' Imprecise Pleading," in which Defendants complain that the allegations in the FAC are too vague. (ECF No. 7-1 at 21–22.) Defendants assert that the FAC does not provide Defendants a reasonable opportunity "to ascertain (1) which entity each claim is brought against, (2) who was the actor carrying out various alleged actions, (3) against whom Plaintiffs seek declaratory relief, and (4) the geographic scope of Plaintiffs' putative claims." (*Id.* at 21.) Defendants alternatively move for a more definite statement with respect to these issues under Federal Rule of Civil Procedure 12(e). That rule provides: "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired."

The Court disagrees with Defendants' contention that the FAC is too vague or that Defendants, based on the FAC, do not have a reasonable ability to prepare a response. The FAC makes clear that Plaintiffs are accusing all Defendants of discriminating against them by subjecting them to harassment, forcing them to engage in unpaid work outside of their job descriptions, denying them benefits, and imposing on them stricter clothing standards. Plaintiffs explicitly name supervisors that were primarily responsible for the discrimination. (*See* FAC ¶ 6 ("Most of this treatment was and is advanced and effected by management employee Habit Tarzi, Site Manager . . . and adopted and endorsed by other management employees including Carol Giannini, General Manager; Weston Giannini, Scheduling Manager; Atiq Hamit, Assistant Site Manager; and David Tarzi, Deputy Project Manager.").) Requiring Plaintiffs to allege more—such as what was said to Plaintiffs or when it was said—would be tantamount to imposing Rule 9(b)'s heightened pleading standards. *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("To satisfy Rule 9(b), a pleading must identify the who,

what, when, where, and how of the misconduct charged . . ." (internal quotation marks omitted)). As discussed above, Plaintiffs have alleged sufficient factual information to raise a plausible inference of discrimination. While general in nature, the allegations are not conclusory—they offer factual allegations indicating that they were treated differently on the basis of their national origin, sex, and religion. *See Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1049–50 (9th Cir. 2012) (holding that plaintiff's "brief" complaint alleging disparate treatment, consisting of a few basic facts identifying the grounds of age discrimination, was sufficient to create a "straightforward" plausible prima facie case). As Plaintiffs' employers, Defendants are in a reasonable position to investigate Plaintiffs' claims and respond to them.

The Court finds it unnecessary to require Plaintiffs to specify in any more definite manner "against whom Plaintiffs seek declaratory relief." The FAC states that Plaintiffs seek "[a] declaratory judgment that the practices complained of in this complaint are unlawful and violate Title VII and 2[8] U.S.C. § 1981." (FAC, Prayer for Relief ¶ 6.) This is a routine request that the Court declare the actions alleged in the FAC unlawful. Defendants may ultimately prove that certain individual defendants did not engage in the actions that are alleged in the FAC. That possibility, however, does not render the allegations themselves improperly vague.

The Court also disagrees with Defendants' assertion that, to have a reasonable opportunity to respond to Plaintiffs' allegations, Defendants need more specificity about the geographic scope of Plaintiffs' putative classes. This putative class action has not yet proceeded to the certification phase. Defendants offer no authority supporting the assertion that specificity in this respect is necessary at the pleading stage. Rather, "[t]he permissible scope of the class, if any, is a question best addressed through a motion for class certification." *Henderson v. J.M. Smucker Co.*, No. CV 10-4524-GHK (VBKx), 2011 WL 1050637, at *2 (C.D. Cal. 2011).

For the same reason, the Court denies Defendants' motion to strike "Plaintiffs' statements regarding the statute of limitations and all allegations prior to the statute of

limitations." (ECF No. 7-1 at 22–24.)  Defendants assert that it is "harassing" for Plaintiffs to craft their putative classes to include employees who have worked for Defendants since 2010.  (*See id.* at 24 ("a class period of more than seven years prior to the filing of this action appears to be an undisguised attempt to gather years of discovery that have no reasonable relation to the claims alleged").)  This again amounts to an attack on Plaintiffs' initial description of their putative classes.  At the motion to dismiss stage, what matters is the allegations relevant to the named Plaintiffs, not the scope of an uncertified putative class.  Defendants may offer objections to the scope of the putative class when Plaintiffs seek certification, if and when this case reaches that phase.

## IV. Conclusion

In sum, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.  The Court dismisses Plaintiffs' Title VII claims because, under 43 U.S.C. § 1626(g), Defendants are excluded from the definition of "employer" for purposes of Title VII.  The court also dismisses Plaintiffs' FEHA claims to the extent they are premised on work performed within the boundaries of Camp Pendleton only.  It is clear that federal law does not permit Plaintiffs' claims under Title VII or under FEHA (to the extent the FEHA claims are premised on work performed within the boundaries of Camp Pendleton), and that "allegations of other facts consistent with the challenged pleadings could not possibly cure the deficiency."  *Miller v. Bank of Am., Nat'l Ass'n*, 858 F. Supp. 2d 1118, 1122 (S.D. Cal. 2012) (quoting *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992)).  The Court therefore dismisses those claims with prejudice.

The Court DENIES Defendants' motion for a more definite statement and DENIES Defendants' motion to strike the class allegations.

The hearing scheduled for January 12, 2018, is VACATED.

**IT IS SO ORDERED.**

Dated:  January 9, 2018

Hon. Gonzalo P. Curiel
United States District Judge